IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SCOTT E. WINGARD,                    )
                                     )
            v.                       )    2:21-CV-1738
                                     )
UNITED STATES OF AMERICA,            )
                                     )
            Defendant.               )
                                     )

## OPINION

**J. Nicholas Ranjan, United States District Judge**

Plaintiff Scott E. Wingard was injured when a United States Postal Service mail carrier failed to stop at an intersection and collided with his vehicle.  He sued the Post Office for negligence under the Federal Tort Claims Act to recover economic and noneconomic damages he sustained in the accident, including lost wages, lost pension benefits, and pain and suffering.

At trial, the Post Office ultimately did not dispute its mail carrier's negligence.  Instead, it argued that Mr. Wingard's body was already deteriorated because of preexisting conditions, such that he would have endured all his damages, including lost income, benefits, and pain and suffering, even if the accident had not occurred.  That is the main dispute before the Court.

Pursuant to the Federal Tort Claims Act (28 U.S.C. § 2402), the Court conducted a nonjury trial on this matter on December 5-9, 2022.  ECF 22; ECF 94; ECF 95; ECF 96; ECF 99; ECF 100.  The parties then submitted proposed post-trial findings of fact and conclusions of law.  ECF 122; ECF 123. Having reviewed the entire record, including the parties' briefs, exhibits, expert reports, and transcripts of proceedings, the Court finds in favor of Mr. Wingard on his claim of negligence and

awards him damages in the amount of $1,362,171 in economic damages and $200,000 in noneconomic damages.

The verdict in this case is largely driven by the Court's finding that but for the rather serious accident, Mr. Wingard was likely to continue in his position as a well-paid union electrician until the age of 60. The Court credits the Post Office's vocational experts that Mr. Wingard is able to mitigate these future losses through a "light work" or sedentary position, and so accounts for that in its calculations. But the Court ultimately doesn't credit the Post Office's medical experts' predictions that Mr. Wingard's eventual need for a knee replacement alone would have caused him to lose his union job entirely within the next two to five years. Mr. Wingard had worked in various manual labor positions despite ailments through the years, and was able to receive treatment as needed and persist in that employment. He had every incentive to do so before the accident, given the lucrative union position he had obtained. Moreover, as Mr. Wingard credibly testified, his union eased people into less demanding roles as they grew older.

Many people have torn menisuses, some arthritis in the knees, and undergo knee replacements. But, as the Post Office's own expert acknowledged, those same people can still play doubles tennis, hike, fish, and continue in their professions. Mr. Wingard cannot do those things. Instead, he sustained a broken femur, endured multiple painful surgeries, and now must hobble with a cane at the age of 49—all caused by the Post Office's negligence, not simply a preexisting condition.

## FINDINGS OF FACT

Pursuant to Federal Rule of Civil Procedure 52(a)(1), and after weighing the competing evidence at trial, including the credibility of the witnesses, the Court makes the following specific findings of fact.

I.      **FACTUAL SUMMARY**

    A.      **Mr. Wingard's employment history and pastimes before the November 15, 2019, accident.**

    1.      Mr. Wingard graduated high school in 1992 and began working at Wheatland Tube Company part-time.  ECF 106 (Wingard), 34:5-23.  He also worked at a garage performing vehicle repairs.  ECF 107 (Wingard), 2:22-3:3.

    2.      Mr. Wingard began full-time employment at Wheatland Tube in 1999, performing general labor and machine operations, and then began an apprenticeship to become an electrician with the company in approximately 2004.  *Id.* at 3:11-4:12. Mr. Wingard completed the apprenticeship in 2009, which included coursework and on-the-job experience.  ECF 106 (Wingard), 34:18-21; ECF 107 (Wingard), 4:10-20.  In that position, he earned $27 per hour, plus overtime pay, and worked approximately 56 hours per week.  ECF 107 (Wingard), 4:21-23, 6:3-5.

    3.      Mr. Wingard left Wheatland Tube in 2011 and began work for Roll Forming Corporation.  ECF 107 (Wingard), 5:18-6:11.  In that role, he worked 40 hours per week, earning $27 per hour.  *Id.* at 6:11-18.

    4.      Mr. Wingard left Roll Forming and began work at the Grove City School District in approximately 2013 in an electrical maintenance position.  *Id.* at 6:19-7:8. He was attracted to the position because of the better benefits for government employees, improved working conditions, and better proximity to his home so he could spend more time with his children.  *Id.* at 7:9-8:4, 38:13-23.  In this position, Mr. Wingard worked 40 hours per week for $17 per hour.  *Id.* at 8:13-18.  He moved to a comparable position at the Greenville School District one year later, and worked there for four years.  *Id.* at 9:15-10:8.

    5.      Mr. Wingard began a union position with the International Brotherhood of Electrical Workers at the Bruce & Merrilees Electric Company, an electrical contractor, in October 2018.  ECF 106 (Wingard), 41:7-15; ECF 107 (Wingard), 12:15-

13:14.  He worked about eight to nine hours per day, six days per week, at a rate of $40-$41 per hour at the Hickory Run Plant.  ECF 106 (Wingard), 41:16-23; ECF 107 (Wingard), 13:12-21.  The increased pay was a major motivating factor for Mr. Wingard to take this position because he planned to retire at age 60.  ECF 106 (Wingard), 41:24-42:5.

6.      The position at the Hickory Run Plant involved considerable manual labor outdoors, including installing and removing pipes, wire, and tubs, as well as climbing stairs.  ECF 106 (Wingard), 43:25-44:14; ECF 107 (Wingard), 13:15-16. However, Mr. Wingard had no difficulties performing that work.  ECF 106 (Wingard), 44:15-25.

7.      Mr. Wingard credibly testified that there is an informal policy at the International Brotherhood of Electricians that as a union member gets older, he is given more managerial, less physically demanding work.  ECF 106 (Wingard), 42:10-19.

8.      In his spare time, Mr. Wingard enjoyed hunting, fishing, and restoring vehicles with his son, Kyle, and hiking with his girlfriend, Amy.  *Id.* at 17:24-18:8, 22:19-23:21.  He also performed chores and restorations around the house, including roofing, plumbing, refinishing, and electrical work.  *Id.* at 19:17-24.

**B.      Mr. Wingard's medical history.**

9.      Mr. Wingard's medical records reflect that he received a right knee scope in 2001.  *Id.* at 102:1-3; Ex. 102.

10.     Mr. Wingard experienced pain, swelling, and decreased range of motion in his right knee, and he was diagnosed with a tear in the meniscus of that knee; he underwent surgery that year to correct the meniscal tear.  ECF 106 (Wingard), 102:4-104:17.

11.     In 2009, Mr. Wingard sought treatment for a back injury he sustained while playing football with his nephew.  *Id.* at 118:1-8.  Following that injury, he was

diagnosed with degenerative disk disease, a typical injury for someone who performs manual labor for a living. *Id.* at 118:11-16. He saw a chiropractor in the subsequent years to address this pain. *Id.* at 119:14-25.

12.     In 2017, Mr. Wingard injured his right shoulder in a motorcycle accident. *Id.* at 110:21-111:6. He experienced pain and decreased range of motion, and was diagnosed with a labral tear and mild impingement of the right shoulder. *Id.* at 111:7-112:22. Mr. Wingard's doctor, Dr. Bonier, recommended surgery and physical therapy to treat this injury; though Mr. Wingard refused that treatment, his shoulder improved nonetheless. *Id.* at 113:8-114:20.

13.     In 2017, Mr. Wingard broke his left wrist while repairing a garage door at the Greenville School District. *Id.* at 29:14-25. He underwent surgery and took approximately three weeks off work to heal, and then returned to work. *Id.* at 30:1-10.

14.     In late 2018, Mr. Wingard returned to Dr. Bonier for right knee pain related to walking, going down steps, stooping, and kneeling. *Id.* at 105:10-107:21. This increased pain correlated with his beginning the physically demanding job with the IBEW. *Id.* at 106:4-19. To address the pain, Dr. Bonier prescribed him ibuprofen and gave him a cortisone injection. *Id.* at 107:7-109:3. Mr. Wingard's condition improved with the injection. *Id.* at 109:1-3.

15.     At that time, Dr. Bonier noted Mr. Wingard has a history of moderate to severe osteoarthritis at the knee. *Id.* at 109:4-6.

16.     Mr. Wingard received mental health treatment for anxiety, panic attacks, and trouble sleeping prior to November 2019. *Id.* at 32:5-20, 114:24-15:17.

17.     Despite these ailments and conditions, Mr. Wingard had no difficulties performing his work as an electrician. *Id.* at 28:11-13, 30:7-10; 31:4-6; 33:12-15.

**C.    Mr. Wingard was involved in a car accident with a Post Office mail carrier in November 2019.**

18.    On November 15, 2019, Mr. Wingard was driving a Jeep Compass through a four-way intersection at Reynolds Industrial Park Road and Brentwood Drive, when his vehicle collided with a Post Office mail carrier vehicle driven by a postal employee, Louanna Stevenson.  ECF 77 (Joint Stipulation regarding testimony of Jennifer Sarcinella); ECF 80 (Joint Stipulation regarding testimony of Lynsie McElhinny); ECF 80-8 (police report).

19.    At trial, the Post Office did not contest the issue of liability.  Instead, the parties stipulated to the testimony of two Post Office employees, Jennifer Sarcinella and Lynsie McElhinny.  ECF 77; ECF 80.  Ms. Sarcinella stated that she appeared at the scene of the accident shortly after it occurred, at which point Ms. Stevenson advised that she did not come to a complete stop at the stop sign before entering the intersection.  ECF 77, ¶ 23.  Ms. McElhinny stated that she investigated the accident and determined that Ms. Stevenson failed to stop at the stop sign before proceeding into the intersection.  ECF 80, ¶¶ 47-48.  The police report likewise concluded that Ms. Stevenson had proceeded into the intersection without stopping.  ECF 80-8 (police report).

20.     Photographs from the accident scene suggest the crash was a fairly significant one: there is considerable damage to the Post Office truck's windshield and front left side, making it undrivable, and Mr. Wingard's jeep was totaled.  Ex. 5 (photographs of accident scene); Ex. 7 (photographs of accident scene); ECF 80-8 (police report), pp. 2-3 (indicating both vehicles sustained "Disabling (severe-not driveable [sic.])" damage).

**D.     Mr. Wingard complained of injuries to his leg, back, neck, and right shoulder.**

21.     After the accident, Mr. Wingard was transported by ambulance to St. Elizabeth's Hospital in Youngstown, Ohio.  Ex. 11.  He complained of right leg pain and believed his right leg was broken.  ECF 80-8 (police report), p. 5.  The paramedics gave him fentanyl for the pain, and noted his right femur was fractured about six inches above the knee.  Ex. 11, pp. 1-3.

22.     While in the hospital, Mr. Wingard complained of severe pain in his right leg, right shoulder, back, and neck.  ECF 106, p. 62:5-17.  He was diagnosed with a fracture of the right femur.  Ex. 132.  Dr. Adrian Butler inserted a rod and screws into Mr. Wingard's leg to repair the fracture on November 16, 2019.  *Id.*; ECF 108, pp. 17:20-19:6; 20:11-16.

23.     Mr. Wingard underwent additional surgery on November 18, 2019 to tighten one of the screws used to repair his fractured right femur.  ECF 108 (Gentile), 15:2-16.  Dr. John Gentile, a partner of Dr. Butler's and one of Mr. Wingard's retained experts, performed the surgery.  *Id.*

24.     A few weeks after the accident, Mr. Wingard reported pain in his right shoulder and received injections to alleviate it.  ECF 108 (Gentile), 24:13-23, 25:7-26:3; ECF 110 (Abraham), 47:18-25, 52:3-12.  Mr. Wingard continued to report shoulder pain when both parties' experts examined him on August 8, 2022.  ECF 108 (Gentile), 26:4-8.

25.     Mr. Wingard reports he still experiences neck pain, including clicking, popping, and catching.  ECF 106 (Wingard), 64:22-65:5; ECF 108 (Gentile), 52:17-25; ECF 110 (Abraham), 53:22-54:12.

**E.   Mr. Wingard was "terminated" from his employment and filed for disability.**

26.    Mr. Wingard has not worked since the day of the accident due to pain and immobility.  ECF 106 (Wingard), 52:5-18.

27.    Believing Mr. Wingard's injuries were "severe," the IBEW terminated Mr. Wingard's employment after the accident as a "courtesy" so he could file for unemployment benefits.  *Id.* at 45:21-46:4.

28.    In February 2020, Mr. Wingard applied for Social Security disability benefits.  ECF 107 (Wingard), 17:10-13; Ex. 137.  He based his disability on injuries to his left wrist, a right elbow fracture, a right femur fracture, and anxiety.  ECF 107 (Wingard), 18:4-17; Ex. 137.  But the SSA denied Mr. Wingard's application.  ECF 107 (Wingard), 38:14-19.

29.    Mr. Wingard applied for reconsideration of the SSA determination and was awarded benefits.  ECF 107 (Wingard), 38:14-22; Ex. 10.  In April 2021, an SSA administrative law judge determined that Mr. Wingard had the following severe impairments: right knee osteoarthritis, right knee medial meniscus tear, right femur fracture, right shoulder impingement, lumbar degenerative disc disease, and cervical arthritis.  Ex. 10, p. 1.  The ALJ also determined that these impairments limited Mr. Wingard's functional capacity to work, that he was unable to perform his prior role as an electrician, that his skills from his electrician job did not transfer to other occupations within his functional capacity to work, and that he was disabled as defined by the SSA.  *Id.* at 2-3.  However, the ALJ also concluded that Mr. Wingard was expected to improve and recommended a continuing review of this determination.  *Id.* at 3.

**F.     Mr. Wingard received subsequent medical treatment on his right knee, right shoulder, and neck.**

30.     After the surgery on his femur, Mr. Wingard reported persistent pain in his right knee.  ECF 108 (Gentile), 31:9-32:2.  On July 1, 2020, Dr. Butler performed arthroscopic surgery on Mr. Wingard's right knee to address that pain.  *Id.*  During the surgery, Dr. Butler noted the presence of cartilage wear and tear, and loose tissue at the knee joint.  *Id.* at 31:9-35:16; ECF 110 (Abraham), 34:7-36:7.  Mr. Wingard reported that this surgery did not relieve his right knee pain.  ECF 108 (Gentile), 35:17-25; ECF 110 (Abraham), 35:9-11.

31.     Mr. Wingard had a partial knee replacement in February 2021.  ECF 108 (Gentile), 39:4-40:19; ECF 122, pp. 7, 26; ECF 123, p. 22.  Dr. Gentile, who was one of two surgeons performing the operation, testified that the surgery was successful because it had improved the alignment, flexion, and stability of the knee. ECF 108 (Gentile), 73:12-74:1.  He also testified that when he performed the surgery, he saw cartilage loss (but not total loss), joint space narrowing, osteophytes, and sclerosis at the knee.  *Id.* at 47:6-48:3.

**G.     Mr. Wingard has suffered physical and emotional injuries, including pain and suffering, inability to work, and decreased enjoyment of life.**

32.     Because of his injuries, and despite seeking treatment, Mr. Wingard is still unable to perform the standing, climbing, crawling, and kneeling implicit in his prior role as an electrician.  ECF 106 (Wingard), 52:5-15.  Additionally, light duty and sedentary work, including sitting for long periods of time, can be painful.  *Id.* at 52:16-20.  At trial, the Court witnessed some of Mr. Wingard's difficulties with sitting and walking firsthand and found them to be genuine.

33.     Mr. Wingard suffers from emotional difficulties following the accident, including nightmares, panic attacks, and flashbacks to the accident when he drives. *Id.* at 82:10-84:17.

34.    Mr. Wingard struggles to walk, sit, and perform chores around the house.  *Id.* at 19:1-21:25.  He is unable to hunt or repair cars the way he did before the accident because of the injuries to his knee.  *Id.* at 23:25-26:4.  He has been unable to travel or go hiking with his girlfriend like before the accident, and their intimate relationship has worsened.  ECF 107 (Garris), 125:16-128:6.

35.    Mr. Wingard estimated that he incurred about $200,000 in out-of-pocket medical expenses following the accident.  ECF 106 (Wingard), 87:12-15.  However, there is no evidence in the record beyond this vague testimony that actually establishes those costs, such as invoices or lien information.[1]  This is so because, as counsel for Mr. Wingard stated on the record, Mr. Wingard "made a tactical decision not to worry about the out-of-pocket expenses Mr. Wingard incurred directly.  I didn't offer evidence.  We don't expect an award on that."  ECF 113, p. 102:10-13.  Considering Mr. Wingard cannot point to any medical record establishing costs in evidence or any other non-speculative evidence of those costs, the Court does not have sufficient evidence to award any medical expenses and so will not do so.

36.    As part of the mandatory administrative claims process, Mr. Wingard filed his Standard Form 95 with the Post Office on February 19, 2021, 15 months after the November 2019 car accident.  Ex. 160.  That form required Mr. Wingard to provide a "sum certain" for any damages that he claimed.  He claimed $2.5 million for personal-injury damages and $12,588.83 in property-loss damages.[2]  *Id.*

---

[1] Mr. Wingard specifically withdrew certain exhibits from the Court's consideration, which included some cost information.  ECF 113, 84:21-85:3.

[2] Mr. Wingard is not seeking damages for property loss in this action.  *See* ECF 113, 103:23-24:19 (describing all damages Mr. Wingard seeks and referring the Court to paragraphs 22-25 of the complaint to outline Mr. Wingard's sought damages, which does not include property loss); ECF 122 (Mr. Wingard's proposed findings and conclusions, making no reference to property-loss damages).

## II.   EXPERTS' TESTIMONY

37.    With one exception, the parties did not challenge the qualifications of the experts in this case.  ECF 107, 61:25-62:12.  As to that exception, the Post Office challenged the testimony of Dr. John Gentile, Mr. Wingard's medical expert, under Federal Rules of Evidence 702 and 703.  ECF 57.  The Court overruled the Post Office's objection in part, finding that Dr. Gentile's methodology was reliable, and that he was permitted to rely on the conclusions and reports of his partner, Dr. Adrian Butler, in reaching his conclusions under Rule 703.  ECF 78, pp. 4-6.  However, the Court sustained the Post Office's objection to Dr. Gentile's opinion regarding the costs of surgery and precluded that testimony.  *Id.* at 6.  So beyond that exception, the Court finds at the outset that all of the following witnesses were qualified to testify as experts.  Fed. R. Evid. 702.

### A.    Medical expert opinions

#### 1.    Dr. John Gentile

38.    Mr. Wingard offered the medical expert testimony of Dr. John Gentile.

39.    Dr. Gentile is a licensed orthopedic trauma surgeon in the State of Ohio, and is board certified by the American Academy of Orthopedics and Surgery and the Osteopathic Association of Orthopedic Surgery.  ECF 108 (Gentile), 6:25-8:3.  He conducts research on orthopedics, including matters concerning spinal injuries, trauma, and joint reconstruction.  *Id.* at 8:10-18.  He has experience performing surgeries on injuries similar to Mr. Wingard's femoral fracture.  *Id.* at 6:25-7:21.

40.    Dr. Gentile was also a fact witness in this case because he performed the follow-up surgery to fix the screws in Mr. Wingard's femur on November 18, 2019.  Findings of Fact, ¶¶ 23, 30.  He is partners with Dr. Butler, who performed the initial surgery on Mr. Wingard's femur.  *Id.*, ¶ 23.

41.    At trial, Dr. Gentile testified to a reasonable degree of medical certainty that the November 15, 2019, accident caused Mr. Wingard's current medical injuries

and conditions.  ECF 108 (Gentile), 15:2-5.  He also stated that Mr. Wingard has physical limitations because of the accident, including loss of motion in his right knee, pain, the need for assistive devices to walk, and the inability to continue work as an electrician.  *Id.* at 53:1-22; Ex. 21 (Expert Report of J. Gentile), pp. 1-7.

42.    Dr. Gentile testified that Mr. Wingard had arthritis in his right knee before the accident.  ECF 108 (Gentile), 37:23-38:6, 45:5-14, 46:4-14, 48:4-20.  He based this opinion in part on his review of Dr. Butler's notes and records because Dr. Butler actually saw inside Mr. Wingard's knee when he performed the arthroscopic surgery.  *Id.* at 46:4-10.  But Dr. Gentile also concluded that this preexisting arthritis was not debilitating or severe enough that Mr. Wingard would have needed a total knee replacement two to five years after the November 15, 2019, accident, as certain of the Post Office's experts claimed.  *Id.* at 48:4-9.  To support this opinion, Dr. Gentile pointed to certain facts (specifically, Mr. Wingard's age at the time of the accident, the existence of alternative procedures to relieve and accommodate knee pain in lieu of a total knee replacement, and the fact that Mr. Wingard performed considerable manual labor, including climbing stairs, just before the accident) that were not consistent with debilitating arthritis or the need for a total knee replacement two to five years after November 15, 2019.  *Id.* at 48:4-49:6.

43.    Dr. Gentile concluded that Mr. Wingard's shoulder pain is attributable in some amount to the November 15, 2019, accident.  *Id.* at 68:1-69:4.  He based that conclusion on a review of Dr. Butler's notes and treatment of Mr. Wingard, and on the fact that Mr. Wingard complained of shoulder pain after the accident but not before.  *Id.* at 27:19-30:2.

### 2.    Dr. William Abraham

44.    The Post Office offered the medical expert testimony of Dr. William Abraham.

45.     Dr. Abraham is a licensed and board-certified orthopedic surgeon in the Commonwealth of Pennsylvania.   ECF 110 (Abraham), 2:21-6:13.   He conducts medical research, including on knee replacements, and has published studies about knee replacements.  *Id.* at 7:12-8:7.  He has experience evaluating and treating neck, back, shoulder, hand, hip, and knee injuries, and has performed partial and total knee replacement surgeries.  *Id.* at 8:19-9:19.

46.     Dr. Abraham evaluated Mr. Wingard for the purpose of offering an expert opinion in this case.  *Id.* at 12:5-10.  Dr. Abraham testified to a reasonable degree of medical certainty that Mr. Wingard's femur injury had healed, that he had extensive and severe arthritis in his right knee, and that his right shoulder pain and neck pain were due to preexisting injuries.  *Id.* at 16:11-19:20; Ex. 175 (Expert Report of W. Abraham), pp. 17-19.

47.     Dr. Abraham testified that Mr. Wingard needed his partial knee replacement because of preexisting, bone-on-bone arthritis.   ECF 110 (Abraham), 36:16-38:5.   He based this opinion on Mr. Wingard's symptoms and prior arthroscopies prior to the November 15, 2019, accident.  *Id.* at 37:25-38:15.

48.     Based on his understanding and experience, and given the severity of Mr. Wingard's arthritis, Dr. Abraham concluded that Mr. Wingard would have needed a knee replacement within two to five years after November 15, 2019, and that this surgery would have prevented him from working as an electrician.  *Id.* at 38:6-39:22, 41:18-43:1.  He added that this surgery would have been necessary even if the accident had not occurred.  *Id.* at 39:17-22.

49.     He further testified that Mr. Wingard's femoral fracture occurred near Mr. Wingard's knee, but did not affect the knee joint in a way that materially affected or aggravated Mr. Wingard's preexisting arthritis.  *Id.* at 38:23-39:16.  However, he acknowledged that surgery on Mr. Wingard's femur could have aggravated his knee. *Id.* at 60:17-61:16.

- 13 -

50.     Dr. Abraham also testified that patients who undergo even total knee replacements can comfortably stand, walk, hike, play golf or tennis, hunt, and perform work that includes lifting 25 pounds. *Id.* at 117:19-118:23.

### 3.     Dr. Richard Kaplan

51.     The Post Office also offered the expert medical opinion and testimony of Dr. Richard Kaplan.

52.     Dr. Kaplan is a physiatrist specializing in evaluating patients with pain and physical disability and treats pain in patients who are recovering from surgery. ECF 111 (Kaplan), 94:7-11, 105:10-106:14.  Dr. Kaplan is a medical consultant for the Social Security Administration, for which he reviews the medical records of people applying for SSA disability benefits. *Id.* at 95:1-11.  Dr. Kaplan underwent training to become a medical consultant for the SSA. *Id.* at 95:12-19.

53.     Dr. Kaplan evaluated Mr. Wingard's medical records and requested that Mr. Wingard perform a functional capacity exam.[3] *Id.* at 96:18-21, 100:19-101:9.

54.     Dr. Kaplan reviewed the results of Mr. Wingard's functional capacity exam and concluded to a reasonable degree of medical certainty that Mr. Wingard could perform light work. *Id.* at 102:20-104:18, 108:20-24.  He agreed that Mr. Wingard was not capable of returning to work as an electrician, but that he could adapt the knowledge he gained as an electrician for other purposes, such as advising customers on their household projects. *Id.*  While he could not point to any specific job recommendation for Mr. Wingard, he was certain that jobs existed that Mr. Wingard could perform despite his physical limitations.  ECF 112 (Kaplan), 5:8-21.

---

[3] A functional capacity exam measures a patient's physical abilities, including how long a patient can sit, stand, walk, push, and pull, their posture, and other markers, at the time of the exam.  ECF 111 (Kaplan), 97:12-99:4.  A patient's report of pain is one factor among others that a physiatrist will consider during the exam. *Id.*

55.     Dr. Kaplan assessed Mr. Wingard's right knee and concluded that, to the extent the November 15, 2019, accident affected the knee, there was no fundamental residual change in its range of motion, strength, or ability that would materially affect his ability to do light work.  ECF 111 (Kaplan), 113:12-114:25.  Dr. Kaplan did not think Mr. Wingard would require any further treatment for injuries sustained from the accident; in other words, Mr. Wingard would be in this same position even if the accident had not occurred.  *Id.* at 115:1-16.

56.     Dr. Kaplan found that Mr. Wingard did not complain of injuries to his neck, back, or right shoulder prior to the accident, and that any injuries to those areas after the accident had resolved when he examined Mr. Wingard.  ECF 112 (Kaplan), 29:16-31:16.

57.     Considering all of this medical expert testimony, the Court is persuaded that Mr. Wingard had preexisting arthritis in his right knee.  That much is really not in dispute.

58.     However, and significantly, the Court does not conclude that a knee replacement alone would have prevented Mr. Wingard from returning to work as an electrician or a capacity similar to his previous jobs.  Rather, it was the impact of the car accident on his leg and knee that has caused Mr. Wingard's inability to engage in future work as electrician.

59.     In reaching this finding, the Court finds persuasive the conclusions of Mr. Wingard's treating physicians, namely: (1) knee replacements are not ordinarily performed on patients of Mr. Wingard's then-age of 45-47; (2) the existence of alternative procedures to relieve and accommodate knee pain in lieu of a total knee replacement; and (3) the fact that Mr. Wingard performed considerable manual labor, including climbing stairs, just before the accident (even with periodic knee pain).  This evidence shows Mr. Wingard's arthritis was not as debilitating as the Post Office

suggests, and also casts Dr. Abraham's estimate of the need for a knee replacement two to five years after November 2019 as too uncertain.

60.    Further, even if the Post Office were correct, and Mr. Wingard would have needed a knee replacement in two to five years even if the accident had not occurred, the Court finds Mr. Wingard likely could have returned to work as a union electrician.  Mr. Wingard had a long history of fully and capably working as an electrician (and in other manual labor jobs) even with knee pain and other bodily ailments, and Mr. Wingard's credible and undisputed testimony that the IBEW would have given Mr. Wingard less labor-intensive work as he got older.

61.    Additionally, Dr. Abraham credibly testified that even with knee replacements, patients can make a full recovery and return to leisure and manual work activities.  To say Mr. Wingard would not have been one of those patients is too speculative.  Indeed, even according to Dr. Abraham, it wasn't really Mr. Wingard's arthritis or lack of physical therapy that has led him to his current condition, but instead the weakness in his leg from the accident and the surgeries.  ECF 110 (Abraham), 119:24-120:22.

62.    For these reasons, the Court finds that Mr. Wingard likely would have worked as a union electrician until the age of 60, as he intended, but for the negligence of the Post Office.

63.    Because the Court rules out the notion that Mr. Wingard's current condition is unrelated to the accident, and considering all of the medical testimony and expert reports presented, the Court finds it is more likely than not that the injuries suffered in the car accident seriously aggravated Mr. Wingard's preexisting knee issues and thus caused his medical, vocational, and personal challenges.

B.    **Vocational expert opinions**

1.    **Heidi Peterson**

64.    Mr. Wingard offered the expert testimony and opinion of Heidi Peterson, a certified rehabilitation counselor and vocational expert employed as a contract associate with Vocational Experts of Ohio.  ECF 107 (Peterson), 55:22-56:2.

65.    Ms. Peterson reviewed six documents to reach her opinion: the expert report and addendum from Dr. Gentile, the police report of the accident, Mr. Wingard's complaint, Dr. Matthew Marlin's economic analysis, Mr. Wingard's deposition, and the opinion of the SSA ALJ who determined that Mr. Wingard was disabled.  *Id.* at 63:17-64:5; Ex. 23 (Expert Report of H. Peterson), p. 1.

66.    After reviewing these materials, Ms. Peterson performed a Transferable Skills Analysis using the LifeStep vocational assessment software.   ECF 107 (Peterson), 70:3-13; Ex. 23 (Expert Report of H. Peterson), p. 4.  First, Ms. Peterson created a work history report for Mr. Wingard.  Then, she cross-referenced that work history with the 12,000+ jobs listed in the Dictionary of Occupational Titles, which are broken down into 72 attributes.  ECF 107 (Peterson), 66:7-67:11.

67.    Based on Mr. Wingard's work history and the attributes in the Dictionary of Occupational Titles, Ms. Peterson ran a Transferable Skills Analysis to determine potential jobs for Mr. Wingard based on the transferable skills he acquired over the course of his work history.  *Id.* at 63:4-8, 71:20-25; Ex. 23 (Expert Report of H. Peterson), p. 22.  To conduct this analysis, Ms. Peterson used the LifeStep software to search for jobs within Mr. Wingard's skillset; however, she only searched for jobs that were characterized as "sedentary, semi-skilled" labor.  ECF 107 (Peterson), 71:20-72:19.  Based on this search, Ms. Peterson concluded that there were no jobs that Mr. Wingard was qualified to perform.  *Id.*; Ex. 23 (Expert Report of H. Peterson), p. 22.

68.     Ms. Peterson did not search for any unskilled positions when conducting her analysis.  ECF 107 (Peterson), 101:4-11.  Additionally, she testified that Mr. Wingard had a high intelligence and ability to learn new skills.  *Id.* at 101:4-106:5.

69.     Ms. Peterson's expert report and testimony show that she relied heavily on the SSA determination that Mr. Wingard was eligible for disability benefits, and that he continued to receive those benefits.  *Id.* at 69:21-23 ("Q. All right.  To what extent are you relying on Judge Stanley's decision to support your opinions in this case? A.  I think they're substantial."), 70:3-13; Ex. 23 (Expert Report of H. Peterson), pp. 3-4 ("I concur" with ALJ and vocational expert's findings that Mr. Wingard's "physical restrictions eliminate his past work history as a viable employment option as the essential functions of such jobs exceed his residual functional capacity, and any competitive employment.").

70.     Ms. Peterson relied on the Dictionary of Occupational Titles from the year 1999, even though more current reference materials exist.  ECF 107 (Peterson), 66:16-22.

71.     Because Ms. Peterson reviewed and heavily relied on only a limited universe of documents, only used the Dictionary of Occupational Titles to support her analysis, and only searched for semi-skilled labor, the Court is not persuaded by Ms. Peterson's conclusion that Mr. Wingard is unable to mitigate his economic damages.

### 2.     Mark Kerestan

72.     The Post Office offered the expert testimony and opinion of Mark Kerestan, a licensed physical therapist for Orthopedic Sports Physical Therapy Associates.  ECF 111 (Kerestan), 3:5-15.  In his work, he receives referrals from the Pennsylvania Office of Vocational Rehabilitation to perform functional capacity evaluations on patients with physical impairments seeking job placement assistance. *Id.* at 4:2-16.

73.     Mr. Kerestan used ErgoScience software to capture objective data about Mr. Wingard's functional capacity, including measures of his heartrate, posture, and the length of time he took to perform tasks.  *Id.* at 6:3-7:10.  Among the tasks Mr. Wingard performed for this test were: lifting, pushing, and pulling objects, sitting, standing, kneeling, climbing stairs, and work performed overhead and bent over, among others.  Ex. 179.  The test results showed that Mr. Wingard can sit frequently, stand occasionally, walk frequently, climb stairs occasionally, and do various other tasks.  Ex. 177, p. 4.

74.     In analyzing the results of the exam, Mr. Kerestan concluded that Mr. Wingard could safely perform light-duty work for a full workday, as defined by the U.S. Department of Labor.  ECF 111 (Kerestan), 9:20-10:22; Ex. 177, p. 1.

### 3.     Jeroen Walstra

75.     The Post Office offered the expert testimony of Jeroen Walstra, an expert vocational rehabilitation professional, who is certified by the American Board of Vocational Experts and American Rehabilitation and Economics Association and works as a vocational expert for the SSA.  ECF 109 (Walstra), 3:25-5:4; Ex. 182 (Expert Report of J. Walstra), pp. 1-2.

76.     To reach his opinion, Mr. Walstra considered findings in the reports of Dr. Abraham, Dr. Kaplan, and Mr. Kerestan.  Ex. 182 (Expert Report of J. Walstra), pp. 13-15.  Specifically, he considered the conclusion that Mr. Wingard was no longer capable of returning to work as an electrician despite maximum improvement to his medical conditions, but that he is capable of working a light or sedentary job at least beginning in August 2022.  *Id.*

77.     The corresponding median wage for unskilled and skilled sedentary and light work jobs was at least $13.03-$16.66 per hour.  *Id.* at 20.  Mr. Walstra offered several skilled and unskilled sedentary and light work jobs available in Pennsylvania, including clerk, telemarketer, and sales positions.  *Id.* at 16-18.  These

positions can be learned to the point of average performance within six months.  *Id.*
at 21.

78.     Considering all of the vocational expert testimony, the Court finds that
Mr. Wingard is capable of performing full-time sedentary or light-duty work.  The
Court also finds that the average wage of these entry-level positions is approximately
$13.03-$16.66 per hour, and that, based on Mr. Wingard's past skills and ability to
learn new skills, he would be capable of reaching at least average performance in
these positions relatively quickly.

      **C.     Damages expert opinions**

            **1.     Dr. Matthew Marlin**

79.     Mr. Wingard offered the expert report and testimony of Dr. Matthew
Marlin, a professor of economics at Duquesne University.  ECF 112 (Marlin), 65:18-
22.  Dr. Marlin was retained to estimate Mr. Wingard's economic losses associated
with the accident, including lost income, lost benefits, and the value of lost household
services.  *Id.* at 70:2-7.  He measured both Mr. Wingard's losses to date (from
November 15, 2019 to August 15, 2022, the time of the expert report) and his future
losses (from August 15, 2022 to Mr. Wingard's expected end-of-life at age 80.2 in
2054).  *Id.* at 82:3-16; Ex. 29 (Expert Report of M. Marlin), p. 2.

80.     In conducting his analysis, Dr. Marlin accepted as a fact that Mr.
Wingard was totally disabled from any future mitigating employment based on the
SSA decision.  ECF 112 (Marlin), 73:13-23.

81.     Dr. Marlin calculated the following losses from November 15, 2019 to
August 15, 2022:

| M. Marlin Calculation of S. Wingard Past Lost Earnings | | | | |
|---|---|---|---|---|
|  | Income | Health Benefits | Household Services | Total |
| Losses | $249,739 | $21,561 | $24,387 | $295,687 |

82.     In order to calculate Mr. Wingard's future losses, Dr. Marlin calculated Mr. Wingard's work-life capacity (WLC) and his work-life expectancy (WLE).  WLC measures Mr. Wingard's uninterrupted work to retirement age of 65; WLE is a statistical measure from a reference table that accounts for factors that would force an individual to leave the workforce during their work-life.  *Id.* at 88:3-11; Ex. 29 (Expert Report of M. Marlin), p. 6; ECF 113 (Marlin), 32:9-33:20.

83.     Dr. Marlin concluded that Mr. Wingard's WLC was 16.4 years (this is equal to Mr. Wingard's age of 48.6 years at the time of the report up to age 65), and that using the WLC, his total future economic loss was $2.2 million.  ECF 112 (Marlin), 88:3-11; Ex. 29 (Expert Report of M. Marlin), p. 10.

84.     Dr. Marlin concluded based on the WLE reference table that Mr. Wingard's WLE was 16.5 years as of November 15, 2019 (when he was 45.8 years old); that 2.8 years had elapsed since November 15, 2019 such that his remaining WLE at the time of the report was 13.7 years; and that, based on a remaining WLE of 13.7 years, his total future economic loss was $1.89 million.  *Id.*

85.     Though he calculated the lost value of household services to Mr. Wingard in both his past and future economic loss figures, Dr. Marlin stated that calculating this value was highly speculative.  ECF 112 (Marlin), 141:13-144:16-23.

### 2.    Matthew Hanak

86.     The Post Office offered the expert report and testimony of Matthew Hanak, a forensic economist with Forensic Human Resources, LLC.  Ex. 184 (Expert Report of M. Hanak); ECF 113 (Hanak), 2:17-23.   Mr. Hanak was retained to determine Mr. Wingard's economic losses stemming from the accident, including lost income and lost benefits.  Ex. 184 (Expert Report of M. Hanak); ECF 113 (Hanak), 4:17-21.  He measured both Mr. Wingard's losses to date (from November 15, 2019 to August 2022, the time of the expert report) and his future losses.  Ex. 184 (Expert Report of M. Hanak), p. 3; ECF 113 (Hanak), 18:7-20:6.

87.     To reach his conclusion, Mr. Hanak relied on the opinion of Dr. Abraham that as of November 15, 2019, even absent the accident, Mr. Wingard had only two to five years of work-life as an electrician remaining.  Ex. 184 (Expert Report of M. Hanak), p. 3, 7; ECF 113 (Hanak), 18:7-21:9.

88.     Based on the expert reports of Dr. Gentile, Dr. Abraham, Mr. Kerestan, and Mr. Walstra, Mr. Hanak also concluded that Mr. Wingard had a post-accident mitigating wage capacity, via full-time, light-duty work, of $13.03-$16.66 per hour.  Ex. 184 (Expert Report of M. Hanak), p. 7; ECF 113 (Hanak), 19:9-20:12.  This creates an average mitigating wage capacity of $14.85 per hour, and a mitigating annual wage of $30,878.  Ex. 184 (Expert Report of M. Hanak), p. 7; ECF 113 (Hanak), 18:7-21:9.  Mr. Hanak calculated mitigating earnings beginning in August 2022, based on Mr. Walstra's expert opinion.  ECF 113 (Hanak), 19:14-20:6.

89.     Based on the two-to-five-year constraint, Mr. Hanak calculated Mr. Wingard's past losses as follows.  Scenario one calculates past lost earnings assuming Mr. Wingard had two years of work-life remaining (ending in 2021), while scenario two calculates past lost earnings assuming he had five years of work-life remaining (where his past losses stop in August 2022, and his work-life ends in November 2024):

| M. Hanak Calculation of S. Wingard Past Lost Earnings, 2- and 5- years of work-life | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Lost Wages | Lost Medical Benefits | Less: Union Dues | Less: Mitigating Wage Capacity | Less: Mitigating Medical Benefits | Less: Mitigating Retirement Benefits | Total Lost Earnings |
| 2 years of work-life as of 11/15/2019 | $170,878 | $0 | -$9,828 | $0 | $0 | $0 | $161,050 |
| 5 years of work-life as of 11/15/2019 | $248,230 | $14,028 | -$14,277 | -$2,059 | -$440 | -$154 | $245,329 |

90.     Mr. Hanak calculated that, based on a maximum remaining work-life of five years, Mr. Wingard's future lost income is $109,102, and his future lost pension benefit is $77,704.  Ex. 184 (Expert Report of M. Hanak), pp. 9-11.  To measure future lost income, Mr. Hanak used Mr. Wingard's last base wage and adjusted medical benefits, and decreased that amount by mitigating wage capacity, benefits, union dues, and retirement contribution.  *Id.* at 9-10.  He also calculated a lost pension based on Mr. Wingard's pre-accident hours worked, the average hours worked specified in the IBEW union agreements, the presumed years remaining as a working electrician, the IBEW formula for calculating pension benefits, and Mr. Wingard's life expectancy age of 80.2 years.  *Id.* at 6, 10-11.

91.     Because the two-year constraint directs that Mr. Wingard was no longer capable of working as an electrician (who could pay into the pension system) in 2021, there is no lost future earning under that scenario.  *Id.*  Thus, Mr. Hanak concluded Mr. Wingard's total two-and-five-year economic losses are as follows:

| M. Hanak Calculation of S. Wingard Total Economic Loss, 2- and 5- years of work-life | | | |
|---|---|---|---|
| | Past Lost Earnings | Future Lost Earning Capacity | Future Lost Pension | Total Economic Loss |
| 2 years of work-life as of 11/15/2019 | $161,050 | $0 | $0 | $161,050 |
| 5 years of work-life as of 11/15/2019 | $245,329 | $109,102 | $77,704 | $432,136 |

92.     The Court finds that the competing methodologies used by both parties' damages experts are well-supported and reasonable, although some modifications are necessary.  Ultimately, the Court finds by a preponderance of the evidence that the figures used by Dr. Marlin are persuasive and reasonably predictive of past and future loss, and so will utilize those figures.  However, the Court will make three important modifications.  First, the Court will calculate future lost income only up to the age of 60, which was Mr. Wingard's anticipated date of retirement, and will adjust

his pension benefit accordingly.  Second, the Court will reduce the future earnings by the mitigation wage $14.85 per hour (or $30,878 annually), the figure used by Mr. Hanak.   Third, the Court finds that Dr. Marlin's calculations of lost "household services" are too speculative, and so will disregard those amounts in calculating economic damages.

## CONCLUSIONS OF LAW

To succeed on his negligence claim, Mr. Wingard must prove the existence of a legal duty that the Post Office owed to him, a breach of that duty, a causal relationship between the Post Office's negligence and his injuries, and damages. *City of Phila. v. Beretta U.S.A. Corp.*, 277 F.3d 415, 422 n.9 (3d Cir. 2002).  As explained above, the Post Office at trial did not contest liability, so the only two elements at issue here are causation and damages.  The Court finds in favor of Mr. Wingard on these remaining elements.

## I.   MR. WINGARD'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The Court first addresses Mr. Wingard's motion for partial summary judgment (ECF 53) on causation and mitigation, to which the Post Office responded in its proposed findings of fact and conclusions of law (ECF 123).

In his brief, Mr. Wingard seeks to apply offensive collateral estoppel, arguing that the Post Office is precluded from relitigating the ALJ's findings and conclusions in the SSA disability decision.   ECF 54, pp. 6-7.   He specifically argues that the parties had a full and fair opportunity to litigate the nature and extent of the injuries he suffered in the collision, his residual functional capacity, and his employability before the ALJ.  *Id.* at 6. The Post Office disagrees, arguing that there is no evidence that the ALJ made a conclusion about the cause of Mr. Wingard's disability, or that

the ALJ made a final judgment on the merits.  ECF 123, pp. 30-31.  The Court agrees with the Post Office that offensive collateral estoppel is not appropriate here.

Courts typically have four requirements before applying collateral estoppel: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action."  *Raytech Corp. v. White*, 54 F.3d 187, 190 (3d Cir. 1995) (citation omitted). But "collateral estoppel is inappropriate if facts essential to the earlier litigated issue have changed."  *Id.* (citing *Montana v. United States*, 440 U.S. 147 (1979)).  The Court retains discretion when applying offensive collateral estoppel.  *Id.*

The very terms of the ALJ's decision preclude application of collateral estoppel. The opinion concludes, "Medical improvement is expected with appropriate treatment.  Consequently, a continuing disability review is recommended in 12 months."  Ex. 10, p. 3.  It would be inappropriate to bind the Post Office to the ALJ's findings given the lack of finality inherent in the decision.  *Jean Alexander Cosms., Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006) ("We have also considered whether the party being precluded had a full and fair opportunity to litigate the issue in question in the prior action and whether the issue was determined by a final and valid judgment." (cleaned up)).

Nor does it appear to the Court that the ALJ did in fact fully consider the "nature and extent of the injuries Plaintiff suffered in the collision."  To the contrary, the Court reads the ALJ's decision as establishing the date of the accident as the disability onset date and finding that Mr. Wingard has suffered pain and dysfunction following the accident—but, importantly, there is no statement causally connecting Mr. Wingard's pain (and especially the "advanced degenerative arthritis" in his knee) to the accident.  *Id.* at 2.  As a result, the Court cannot conclude that the broad issue

of "nature and extent of the injuries Plaintiff suffered in the collision" was actually litigated.

For these reasons, collateral estoppel does not apply, and the Court will deny the motion.[4]

## II.    CAUSATION AND DAMAGES

### A.    Causation

On the issue of causation, the main question is: did the November 15, 2019, accident cause Mr. Wingard's knee issues (and subsequent pain and suffering, and diminished capacity to work), or was Mr. Wingard predisposed to such debilitating arthritis that he would have been in the exact same position he is now even if the accident had not occurred?

As explained in the Court's findings of fact above, the Court concludes it is more likely than not Mr. Wingard would not have been in the position he is today but for the accident.  The Court is persuaded by two key lines of evidence.

First, the Court concludes that Mr. Wingard's arthritis was not so severe that he would have been unable to work as an electrician or in a similar capacity by 2024. The evidence shows that he was working as an electrician—with all the physical demands of that job—leading up to the accident; and while he had pain in his knee and other areas of his body, he continued to do the work.  That evidence does not support the idea Mr. Wingard was on the verge of a career-ending arthritic injury.

---

[4] In any event, Mr. Wingard filed his motion for the purposes of saving time at trial. ECF 63, p. 9 ("if the [motion for partial summary judgment] is granted, it will substantially shorten the trial of this case and significantly reduce the expenses the parties incur[.]").  As explained to the parties, the Court determined it would ultimately be beneficial and efficient to hear the complete testimony and decide any remaining legal issues after trial.  ECF 79.  Thus, even if collateral estoppel could apply here, the Court would nonetheless exercise its discretion in this case in declining to apply it.

This is further bolstered by evidence from Dr. Butler and Dr. Gentile, the only physicians in this case who actually looked inside Mr. Wingard's knee.

Second, even if Mr. Wingard's arthritis was debilitating enough to necessitate a total knee replacement, the Court is not persuaded that surgery definitively would have meant the end of his career. There is credible testimony from both sides that many patients of similar age to Mr. Wingard go on to make full recoveries and enjoy the work and leisure they engaged in before the surgery. Additionally, Mr. Wingard credibly testified that his career would have shifted to less labor-intensive work as he approached retirement age, given the practices at the union.

Thus, the Court concludes that based on the preponderance of the evidence, the Post Office's negligence caused Mr. Wingard's injuries, which included his loss of future employment.

### B.    Damages

Given the foregoing, the Court also concludes that Mr. Wingard has suffered damages because of the accident: he has suffered physical and emotional pain, he has lost the ability to do the work he was trained to do, and he is limited in his hobbies and enjoyment of life.

### 1.    The FTCA caps Mr. Wingard's damages to the losses he claimed on his Standard Form 95.

To begin with, the Court considers the maximum amount that it could award Mr. Wingard and finds that he is limited to seeking no more than $2.5 million in damages.

Mr. Wingard seeks $2.429 million to $2.742 million in economic damages, plus additional amounts of noneconomic damages to compensate him for pain and suffering, embarrassment, loss of enjoyment of life, and disfigurement. ECF 122, pp. 59-60. But the Post Office argues that Mr. Wingard's damages (both economic and noneconomic) are capped by the Federal Tort Claims Act. Since Mr. Wingard only

claimed $2.5 million in personal-injury losses when he filed his Standard Form 95 with the Post Office, the Post Office argues that he is limited to no more than that amount at trial.  Ex. 160.  The Court agrees.

The "sum certain" requirement on the Standard Form 95 is a function of the government's waiver of sovereign immunity given effect by the FTCA, "and the conditions upon which the government consents to be sued must be strictly observed and exceptions thereto are not to be implied."  *White-Squire v. U.S. Postal Serv.*, 592 F.3d 453, 458 (3d Cir. 2010) (cleaned up).  That standard is high, and for good reason.  "The goal of the administrative claim requirement is to let the government know what it is likely up against: mandating that a claimant propound a definite monetary demand ensures that the government will at all relevant times be aware of its maximum possible exposure to liability and will be in a position to make intelligent settlement decisions."  *Reilly v. United States*, 863 F.2d 149, 173 (1st Cir. 1988) (cleaned up).

Mr. Wingard makes two arguments to circumvent the damages cap, neither of which is persuasive.  First, he argues that the cap does not apply to noneconomic damages.  But he cites no authority to suggest that noneconomic damages exist outside the "sum certain" requirement.  Because the "sum certain" requirement derives from the government's waiver of sovereign immunity for the purpose of providing notice, to hold otherwise and remove noneconomic damages from the notice requirement would subvert that purpose and render the provision meaningless.

Second, Mr. Wingard attempts to invoke a limited statutory exception to the "sum certain" requirement.  Section 2675(b) provides that a plaintiff may exceed the damages cap "where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim."  28 U.S.C. § 2675(b).  Mr. Wingard essentially argues that fairness requires a verdict

in excess of the $2.5 million he demanded in his Standard Form 95 because he filed "just three days after he underwent partial knee replacement surgery" and "had no way of quantifying the amount of pain and suffering he would experience in the months and years to come, the fact that he would require a total knee replacement surgery at some point in the future, or the extent to which his life would continue to be adversely affected and essentially destroyed by the accident." ECF 122, pp. 76-77. But the Court finds Mr. Wingard cannot meet his burden to trigger this exception.

Mr. Wingard filed his Standard Form 95 on February 19, 2021, 15 months after the November 2019 car accident. Ex. 160. By that time, he had undergone all of the relevant surgeries in this case, had not worked for that entire length of time, and had lived with pain for 15 months. He cites vague "applicable time constraints" that forced him to apply at that time, but by the terms of the FTCA, he still had until November 2021 to bring the claim. 28 U.S.C. § 2401(b). It seems evident that Mr. Wingard had a full understanding of his condition when he filed, including the possibility of a total knee replacement (since he in fact underwent several knee arthroscopies and examinations, including in July 2020), or else had additional time to assess his needs. Indeed, Mr. Wingard has offered no evidence to suggest that his condition has worsened since February 2021. For these reasons, the exception to the cap does not apply, and any misjudgment in calculating damages should fall on Mr. Wingard, not the Post Office. *Reilly*, 863 F.2d at 173 ("If a plaintiff misjudges, as to matters known or easily deducible when her claim is filed, it seems more equitable for her to bear the burden of miscalculation than to impose it on the sovereign.").

Accordingly, Mr. Wingard's total damages cannot exceed $2.5 million.[5]

---

[5] Also, any award in this case cannot include pre-judgment interest or punitive damages, which are not recoverable under the FTCA. 28 U.S.C. § 2674. As for post-judgment interest, that award may only be sought if and to the extent the Post Office appeals this decision. 31 U.S.C. § 1304(b)(1)(A).

### 2.     The Court will award economic damages in the amount of $1,362,171 to Mr. Wingard.

As explained above, the Court finds that Mr. Wingard, through the expert analysis of Dr. Marlin, has met his burden of proof on economic damages (with some modifications).

To begin with, the Court awards past economic damages (up to the date of trial) in the amount of $271,613.[6] That amount is supported by Dr. Marlin's analysis. The Post Office's expert, Mr. Hanak, reached a slightly lower figure of about $245,000. The difference was driven largely by the wage rate, with Dr. Marlin calculating wages based on Mr. Wingard's union wage rate, and Mr. Hanak using a weighted average over the last several years of Mr. Wingard's employment history (including prior lower paying maintenance jobs). The Court finds that the union wage is a better data point, because Mr. Wingard's prior maintenance positions for school districts were due to his desire to have a job that allowed him to spend more time with his children, and his children are now grown.[7]  ECF 106, 38:13-23.

With respect to future economic damages, the Court will also use Dr. Marlin's analysis, but will calculate future losses only up through Mr. Wingard's anticipated

---

[6] This number reflects Dr. Marlin's past economic losses of $296,000, less his calculated value of lost household services. The Court accepts Mr. Hanak's conclusion not to account for damages for lost household services because Mr. Wingard is capable of driving, running errands, and shopping, indicating he can perform household services. ECF 113 (Hanak), 27:11-29:3. The Court also rejects Dr. Marlin's analysis on this point because Dr. Marlin admitted that in order to calculate lost household services, he would "have to know a whole lot of information, which we don't have," that "there are all sorts of holes" in his methodology, and that "trying to estimate how much value someone does contribute to the household" is "pretty nebulous." ECF 112 (Marlin), 141:13-144:16-23.

[7] Mr. Hanak also reduced his calculation by the value of *de minimus* expenses saved, like union dues. But the Court agrees with Dr. Marlin that reduction of any *de minimus* amounts is unnecessary because those saved expenses appear as lost value elsewhere. ECF 112 (Marlin), 125:4-16. For example, union membership offered several benefits with monetary value to Mr. Wingard. So if the Court were to

retirement age of 60.  Further, the Court finds that Mr. Wingard could mitigate his future damages by performing sedentary light work, which would earn a wage of $30,878 per year.[8]  Therefore, the Court will subtract from Dr. Marlin's analysis of future losses 11.3 years of wages at this annualized mitigation figure.  Thus, Mr. Wingard's future economic damages (inclusive of wages, pension, and insurance benefits, and less the mitigation amounts) totals $1,090,588, as follows:

| End Date | Age | Income | Pension[9] | Insurance | Less Mitigation | Total |
|---|---|---|---|---|---|---|
| 12/31/2022 | 48.9 | $28,008 | | $2,415 | $10,283 | $20,140 |
| 12/31/2023 | 49.9 | $93,360 | | $8,049 | $30,878 | $70,531 |
| 12/31/2024 | 50.9 | $93,360 | | $8,049 | $30,878 | $70,531 |
| 12/31/2025 | 51.9 | $93,360 | | $8,049 | $30,878 | $70,531 |
| 12/31/2026 | 52.9 | $93,360 | | $8,049 | $30,878 | $70,531 |
| 12/31/2027 | 53.9 | $93,360 | | $8,049 | $30,878 | $70,531 |
| 12/31/2028 | 54.9 | $93,360 | | $8,049 | $30,878 | $70,531 |
| 12/31/2029 | 55.9 | $93,360 | | $8,049 | $30,878 | $70,531 |
| 12/31/2030 | 56.9 | $93,360 | | $8,049 | $30,878 | $70,531 |
| 12/31/2031 | 57.9 | $93,360 | | $8,049 | $30,878 | $70,531 |
| 12/31/2032 | 59 | $93,360 | | $8,049 | $30,878 | $70,531 |
| 12/31/2033 | 60 | $93,360 | | $8,049 | $30,878 | $70,531 |
| 12/31/2034 | 61 | | $14,583 | | | $14,583 |
| 12/31/2035 | 62 | | $14,583 | | | $14,583 |
| 12/30/2036 | 63 | | $14,583 | | | $14,583 |
| 12/31/2037 | 64 | | $14,583 | | | $14,583 |

decrease Mr. Wingard's award by the amount of dues he would have saved, it would only make sense to increase the award by the value of the other lost fringe benefits.

[8] There was no evidence presented at trial by the Post Office as to the increase in this mitigation wage rate in the future, and so the Court does not adjust it to account for future increases in wages for light or sedentary work.  ECF 109 (Walstra), 51:20-52:2 (testifying median mitigating wage is "around $13 and probably won't change very much").

[9] The Court calculated the value of Mr. Wingard's lost pension using the formula described in Dr. Marlin's expert report, but adjusted the "years of service" figure to 14.25 years (from October 2018 to retirement age, on December 31, 2033).  Ex. 29 (Expert Report of M. Marlin), p. 7.

| End Date | Age | Income | Pension[9] | Insurance | Less Mitigation | Total |
|----------|-----|--------|-----------|-----------|-----------------|-------|
| 12/31/2038 | 65 | | $14,583 | | | $14,583 |
| 12/31/2039 | 66 | | $14,583 | | | $14,583 |
| 12/30/2040 | 67 | | $14,583 | | | $14,583 |
| 12/31/2041 | 68 | | $14,583 | | | $14,583 |
| 12/31/2042 | 69 | | $14,583 | | | $14,583 |
| 12/31/2043 | 70 | | $14,583 | | | $14,583 |
| 12/31/2044 | 71 | | $14,583 | | | $14,583 |
| 12/31/2045 | 72 | | $14,583 | | | $14,583 |
| 12/31/2046 | 73 | | $14,583 | | | $14,583 |
| 12/31/2047 | 74 | | $14,583 | | | $14,583 |
| 12/30/2048 | 75 | | $14,583 | | | $14,583 |
| 12/31/2049 | 76 | | $14,583 | | | $14,583 |
| 12/31/2050 | 77 | | $14,583 | | | $14,583 |
| 12/31/2051 | 78 | | $14,583 | | | $14,583 |
| 12/31/2052 | 79 | | $14,583 | | | $14,583 |
| 12/31/2053 | 80 | | $14,583 | | | $14,583 |
| 3/15/2054 | 80.2 | | $2,917 | | | $2,917 |
| Total | | $1,054,968 | $294,577 | $90,954 | $349,941 | $1,090,558 |

In sum, the Court awards total economic damages in the amount of $1,362,171.

### 3. The Court will award noneconomic damages of $200,000 to Mr. Wingard.

"Pennsylvania law allows compensation for a loss of life's pleasures as a component of damages for pain and suffering to an individual who sustained bodily harm due to another's tortious conduct. It is well-settled that embarrassment and humiliation and loss of ability to enjoy the pleasures of life are recoverable damages in tort cases when they stem from a physical injury. No precise measure exists to determine noneconomic damages for emotional or psychological injuries—the guiding standard entails a determination of fairness and reasonableness[.]" *Abed-Rabuh v. Hoobrajh*, No. 17-15, 2019 WL 4935483, at *3 (W.D. Pa. July 3, 2019) (Gibson, J.) (cleaned up).

Mr. Wingard's life has changed because of the November 15, 2019, accident. He underwent several painful surgeries, including having a rod and screws placed in

his leg.  In order to walk, he must use a cane.  He cannot participate fully in many of the activities that brought him joy in the way that he could before the accident.  This has affected his relationships as well.  These are real harms for which he should be compensated.

In light of these losses and acknowledging that there is no precise way to calculate for them, the Court awards $200,000 to Mr. Wingard as noneconomic damages.

### 4.   The Court will not hold counsel for the Post Office in contempt and will not award sanctions.

Mr. Wingard also moved the Court to hold counsel for the Post Office in contempt and award Rule 11 sanctions.  ECF 121.  He then filed an amended motion for sanctions under both Rule 11 and Rule 37.  ECF 131.  He argues that the Post Office did not litigate at trial all its affirmative defenses in its answer to Mr. Wingard's complaint, and so should be sanctioned under Rule 11.  *Id.*, ¶ 36 ("[A] careful review of the evidence Defendant had in its possession when it filed its Answer leads to the undeniable conclusion that it not only had no facts or evidence to support affirmative defense numbers 1-10, 15-16, and 19-21, but it had clear and convincing evidence to establish that those affirmative defenses were false and should not have been plead in the first place.").  He also contends that the Post Office's refusal to admit liability forced him to take two witness depositions, so he should be compensated for those costs and opportunity costs under Rule 37.  *Id.*, ¶¶ 40-49. Finally, he essentially posits that the system is "unfair," so Mr. Wingard should be

compensated $25,000. *Id.*, ¶¶50-53. Counsel for the Post Office disputes each of these claims. ECF 126; ECF 133.

Turning first to the motion for Rule 11 sanctions, the Court denies the motion, both for Mr. Wingard's failure to comply with the Rule's procedure and under the Rule's standard of reasonableness.[10]

Rule 11 requires that any motion for sanctions "be served but not filed or presented to the court if the challenged action is withdrawn or appropriately corrected within 21 days after service." *Metro. Life Ins. Co. v. Kalenevitch*, 502 F. App'x 123, 124 (3d Cir. 2012) (cleaned up). The Third Circuit has held that this rule is mandatory. *Id.* at 125 ("This Court has recognized that, if the twenty-one-day period is not provided, the Rule 11 motion must be denied." (cleaned up)). Even though he admits that notice is a requirement under Rule 11, ECF 131, p. 1, Mr. Wingard did not provide such notice to the Post Office before filing. For this reason alone, the motion must be denied. *See, e.g., Brenner Tool & Die, Inc. v. Crest Ultrasonics Corp.*, No. 93-6205, 1995 WL 80144, at *1 (E.D. Pa. Feb. 27, 1995) (dismissing post-judgment motion for Rule 11 sanctions against defendant for

---

[10] "In determining whether Rule 11 sanctions are appropriate, a court must look objectively as to whether the imposition of sanctions would be reasonable under the circumstances. In deciding whether something is reasonable under this rule, courts look at several factors, including, the amount of time available to the signer for conducting the factual and legal investigation; the necessity for reliance on a client for the underlying factual information; the plausibility of the legal position advocated; whether the case was referred to the signer by another member of the Bar; and the complexity of the legal and factual issues implicated. Although these factors may aid the Court in its analysis, the Court need not work mechanically through each factor before deciding whether to impose a sanction under Rule 11. The applicable standard is one of reasonableness under the circumstances." *Medina v. Haas*, No. 21-1000, 2022 WL 2307098, at *3 (M.D. Pa. June 27, 2022) (cleaned up).

"allegedly violative pleadings" where plaintiff failed to comply with Rule 11 procedure, including 21-day notice provision).

But even if the Court ignored the procedural requirement, it would still deny the motion on the merits. The Post Office's affirmative defenses were reasonable under the circumstances. All of the challenged affirmative defenses raise questions of fact, and the Post Office was permitted to explore those defenses in discovery. The parties' experts opined on many of these defenses at trial, such as defense 6 (Plaintiff's injuries not proximately caused by the accident), 19 (some or all of Plaintiff's medical treatment following the accident was unnecessary), and 20 (Plaintiff's alleged damages were caused by pre-existing injuries). Also, the driver of the Post Office carrier involved in the accident herself provided conflicting statements about whether she did or did not stop before proceeding into the intersection, necessarily raising a question of fact as to liability at that time. ECF 80, p. 2; ECF 80-2. So it cannot be said that the Post Office's decision to allege these defenses was frivolous or unreasonable. And to the extent the Post Office concluded that certain of its affirmative defenses ultimately lacked merit, it abandoned them—and the Post Office had no continuing duty to amend its answer in doing so. *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 95 (3d Cir. 1988) ("Imposing a continuing duty on counsel to amend or correct a filing based on after-acquired knowledge is inconsistent with the Rule."). In short, these are not the "exceptional circumstances" necessitating sanctions that Rule 11 contemplates. *Ario v. Underwriting Members of Syndicate 53 at Lloyds*, 618 F.3d 277, 297 (3d Cir. 2010) (citation omitted), *as amended* (Dec. 7, 2010).

Nor are sanctions appropriate under Rule 37 for purported discovery violations. Unlike with Rule 11 sanctions, where the Court must impose sanctions if

it finds a violation,[11] the Court retains discretion to impose Rule 37 sanctions.[12]  *In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*, No. 09-210, 2012 WL 3928278, at *8 (W.D. Pa. Sept. 7, 2012) (Conti, J.).  The Court may order sanctions "unless the failure to disclose was either 'substantially justified' or 'harmless.'"  *Focht v. Nationstar Mortg., LLC*, No. 18-151, 2019 WL 4860632, at *2 (W.D. Pa. Oct. 2, 2019) (Gibson, J.).

Mr. Wingard contends that counsel for the Post Office provided deficient initial disclosures and failed to supplement them regarding two Post Office employees (Jennifer Sarcinella and Lynsie McElhinny), and failed to admit fault on liability, which forced Mr. Wingard to take the depositions of those two witnesses.  ECF 131, pp. 6-7.  The Court finds that such asserted violations were harmless because these witnesses were disclosed during discovery, and there is no evidence of bad faith or willfulness on behalf of counsel for the Post Office.  So any sanction under Rule 37 is also inappropriate.

---

[11] Fed. R. Civ. P. 11 (upon finding that a pleading has been signed in violation of Rule 11, the court "shall impose . . . an appropriate sanction").

[12] The Court is guided by the following *Pennypack* factors: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's order.  *Enterprise Rent-A-Car*, 2012 WL 3928278, at *8-9 (cleaned up).

## **CONCLUSION**

For the foregoing reasons, the Court finds in favor of Mr. Wingard, and awards him economic and noneconomic damages as outlined in this opinion.  By operation of this opinion, the motions at ECF 54, ECF 121, and ECF 131 will be denied.  A judgment order follows.

DATE: March 29, 2023                                  BY THE COURT:

                                                                         */s/ J. Nicholas Ranjan*
                                                                         United States District Judge